UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NANCY R. LUALHATI<br><br>  Plaintiff,<br><br>  v.<br><br>MICHAEL J. ASTRUE,<br><br>  Defendant.<br>_____/ | No. C-10-0341 EMC<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT; AND GRANTING MOTIONS FOR REMAND**<br><br>**(Docket Nos. 16, 19)** |

In February 2007, Plaintiff Nancy R. Lualhati filed for disability insurance benefits. Ms. Lualhati has exhausted her administrative remedies with respect to her claim of disability. This Court has jurisdiction for judicial review pursuant to 42 U.S.C. § 405(g). Ms. Lualhati has moved for summary judgment or, in the alternative, a remand for additional proceedings. The Commissioner has cross-moved for summary judgment or a remand. Having considered the parties' briefs and accompanying submissions, the Court hereby **DENIES** the parties' cross-motions for summary judgment but **GRANTS** their alternative motions to remand for further proceedings.

## I.  FACTUAL & PROCEDURAL BACKGROUND

In February 2007, Ms. Lualhati filed for disability insurance benefits, alleging disability as of October 15, 2005, based on a heart problem, emphysema, rheumatoid arthritis, and depression. *See* AR 92 (application summary); AR 69 (notice of disapproved claims). Ms. Lualhati's application was initially denied on June 11, 2007, *see* AR 69-73 (notice of disapproved claims), and again on reconsideration on September 28, 2007. *See* AR 77-81 (notice of reconsideration). Ms. Lualhati

then sought an administrative hearing before an administrative law judge ("ALJ").  *See* AR 82 (request for hearing by ALJ).  A hearing was held before ALJ Thomas J. Gaye on February 19, 2009.  *See* AR 42 *et seq.* (ALJ hearing).  At the hearing, Ms. Lualhati amended the date of onset from October 15, 2005, to January 1, 2007, which was "the last day that she actually worked."  AR 46.

On March 16, 2009, the ALJ held that Ms. Lualhati was not disabled under the Social Security Act.  *See* AR 21-27 (ALJ decision).  The ALJ evaluated Ms. Lualhati's claim of disability using the five-step sequential evaluation process for disability required under federal regulations.  *See* 20 C.F.R. § 404.1520.

> Step one disqualifies claimants who are engaged in substantial gainful activity from being considered disabled under the regulations.  Step two disqualifies those claimants who do not have one or more severe impairments that significantly limit their physical or mental ability to conduct basic work activities.  Step three automatically labels as disabled those claimants whose impairment or impairments meet the duration requirement and are listed or equal to those listed in a given appendix.  Benefits are awarded at step three if claimants are disabled.  Step four disqualifies those remaining claimants whose impairments do not prevent them from doing past relevant work considering the claimant's age, education, and work experience together with the claimant's residual functional capacity ("RFC"), or what the claimant can do despite impairments.  Step five disqualifies those claimants whose impairments do not prevent them from doing other work, but at this last step the burden of proof shifts from the claimant to the government.  Claimants not disqualified by step five are eligible for benefits.

*Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003).

At step one, the ALJ found that Ms. Lualhati had not engaged in substantial gainful activity since January 1, 2007, the alleged onset date.  *See* AR 23 (ALJ decision).  At step two, the ALJ determined that Ms. Lualhati suffered from the following severe impairments: sleep apnea, degenerative arthritis of the hands and hip joints, history of emphysema, history of atrial fibrillation, and obesity.  *See* AR 23.  The ALJ concluded that Ms. Lualhati did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *See* AR 24.  While the ALJ found that Ms. Lualhati's "medically determinable mental impairment[s] of mood disorder and dysthymic disorder" were not severe, AR 23, he did take into account the functional limitations from these mental impairments at

2

step four, when he assessed Ms. Lualhati's residual functional capacity. *See* AR 24. As for step four, the ALJ held that Ms. Lualhati had the residual functional capacity to perform the full range light work as defined by the regulations. *See* 20 C.F.R. §§ 404.1567(b). The ALJ noted that an examining physician as well as state agency consultants had assessed an exertional capacity for medium work but ultimately he determined that light work was a more appropriate assessment, giving Ms. Lualhati "the benefit of the doubt regarding the extent of her complaints" regarding fatigue and difficulty with concentration. *See* AR 27. Based on this residual functional capacity, the ALJ concluded, at step five, that Ms. Lualhati was capable of performing her past relevant work as an accounting clerk, general office clerk, customer service representative, and telephone solicitor. *See* AR 27. In arriving at this conclusion, the ALJ relied largely upon the hearing testimony of a vocational expert. *See* AR 27. Accordingly, the ALJ deemed Ms. Lualhati not disabled from the alleged onset date of January 1, 2007, through the date of his decision (*i.e.*, March 16, 2009). *See* AR 27.

Thereafter, Mr. Lualhati sought review of the ALJ decision but her request for review was denied by the Appeals Council on September 2, 2009. *See* AR 4-6 (notice of Appeals Council action). This petition ensued.

## II. DISCUSSION

As the Ninth Circuit has explained, a court

> may set aside the Commissioner's denial of benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. A court review[s] the administrative record as a whole to determine whether substantial evidence supports the ALJ's decision. . . . [W]here the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed.

*Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal quotation marks omitted); *see also Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). "The ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041-42 (9th Cir. 2008).

In the instant case, Ms. Lualhati argues that the ALJ's decision was erroneous for the following reasons: (1) the ALJ improperly concluded, at step two, that she did not have a severe mental impairment; (2) at step four, the ALJ incorrectly assessed her residual functional capacity because he failed to take into account the fact that she was diagnosed with fibromyalgia, incontinence, and Sjogren's syndrome; (3) the ALJ failed to give clear and convincing reasons for rejecting her credibility; (4) the ALJ failed to provide specific, cogent reasons for rejecting the testimony of her lay witnesses; and (5) the ALJ's conclusion that she could perform her past relevant work was not supported by substantial evidence. Each of these contentions is addressed below.

A.   Mental Impairment

As noted above, at step two of the five-step sequential evaluation process, an ALJ considers the medical severity of the claimant's impairments. In the instant case, the ALJ concluded that Ms. Lualhati had severe physical impairments but not any severe mental impairments. *See* AR 23 (ALJ decision). Ms. Lualhati contends that the ALJ erred in making this step two determination.

Title 20 C.F.R. § 404.1520 explains the five-step sequential evaluation process used to determine whether a claimant is disabled. With respect to step two, the regulation provides that, if a claimant "do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement," then the claimant is considered not disabled. 20 C.F.R. § 404.1520(a)(4)(ii).

When a claimant allegedly has a severe mental impairment, an ALJ is required to follow a special technique at step two. *See id.* § 404.1520a. "Under the special technique, [the ALJ] must first evaluate [the claimant's] pertinent symptoms, signs, and laboratory findings to determine whether [she has] a medically determinable mental impairment(s)." *Id.* § 404.1520a(b)(1). If so, then the ALJ "must then rate the degree of functional limitation resulting from the impairment(s)." *Id.* § 404.1520a(b)(2). There are "four broad functional areas" used to rate the degree of a claimant's functional limitation: "Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." *Id.* § 404.1520a(c)(3).

4

Case 3:10-cv-00341-EMC   Document 21   Filed 07/29/10   Page 5 of 20

> When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more.

*Id.* § 404.1520a(c)(4).

After rating the degree of functional limitation, an ALJ then determines the severity of the mental impairment.

> If we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe, *unless* the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities (see § 404.1521).

*Id.* § 404.1520a(d)(1) (emphasis added). Under § 404.1521, "[a]n impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." *Id.* § 404.1521(a).

In the instant case, the ALJ concluded that Ms. Lualhati's "medically determinable mental impairment causes no more than 'mild' limitation in any of the first three functional areas and 'no' episodes of decompensation which have been of extended duration in the fourth area[;] [therefore], it is nonsevere." AR 24 (ALJ decision). Implicitly, the ALJ did not find that there was "more than a minimal limitation in [Ms. Lualhati's] ability to do basic work activities" as a result of her mental impairment. *Id.* § 404.1520a(d)(1). In her papers, Ms. Lualhati challenges the ALJ's implicit finding – arguing that the medical evidence shows that her mental impairments were more than "a slight abnormality that ha[d] 'no more than a minimal effect on [her] ability to work.'" *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). Ms. Lualhati emphasizes that "the step-two inquiry is [simply] a de minimis screening device to dispose of groundless claims." *Id.*

For purposes of this opinion, the Court need not make any decision as to whether the ALJ erred in his step two analysis because any such error was harmless. More specifically, any error was harmless because, even if the ALJ did not consider any mental impairment of Ms. Lualhati to be severe for purposes of step two, he still considered the functional limitations arising from the mental impairment at step four as part of his assessment of Ms. Lualhati's residual functional capacity. *See*

5

AR 24 (ALJ decision) (stating that "the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis"). The Ninth Circuit has expressly held that an ALJ's failure to list an impairment at step two is harmless where the ALJ considers any limitations imposed by the impairment at step four. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (concluding that any failure to list bursitis as severe at step two was harmless error where ALJ considered functional limitations of bursitis at step four); *Burch*, 400 F.3d at 682, 684 (concluding that the ALJ did not commit reversible error in not considering the claimant's obesity at step two because the ALJ adequately considered the claimant's obesity in his residual functional capacity determination); *see also Baldwin v. Astrue*, No. ED CV 09-513-PJW, 2010 U.S. Dist. LEXIS 46175, at *5 (C.D. Cal. May 10, 2010) (stating that, even if "the ALJ erred at step two, any error was harmless because the ALJ accounted for the symptoms and limitations allegedly caused by her fibromyalgia in his residual functional capacity determination at step four").

In her papers, Ms. Lualhati suggests that the ALJ did not consider any functional limitations arising from her mental impairment at step four, but this is belied by the ALJ's written decision. In the decision, the ALJ explicitly discussed at step four a psychiatric examination of Ms. Lualhati that was conducted on April 17, 2007. *See* AR 25 (ALJ decision). In addition, the ALJ expressly discussed at step four Ms. Lualhati's complaints of fatigue and trouble with concentration. *See* AR 26 (ALJ decision). In fact, the ALJ even lowered Ms. Lualhati's exertional capacity from medium to light work based on her complaints of, *inter alia*, fatigue and trouble with concentration. *See* AR 27. Therefore, Mr. Lualhati's suggestion has no merit. Similarly, her contention that the ALJ did not consider at step four the combined effects of her physical and mental impairments has no basis given the above.

The only issue remaining is whether the ALJ erred at step four in essentially finding the functional limitations arising from Ms. Lualhati's mental impairment to be minimal.[1] Here, Ms.

---

[1] Although Ms. Lualhati did not expressly make this step four argument in her papers, largely confining her challenge to step two, the Court addresses the argument to the extent it might be inferred from the step two argument.

6

Lualhati's basic assertion is that the ALJ improperly rejected the opinion of a nontreating, examining physician, Ronald F. Johnson. *See* AR 255-58 (Johnson opinion, dated 4/12/2007).

Dr. Johnson conducted a psychiatric examination of Ms. Lualhati on April 12, 2007. He diagnosed Ms. Lualhati as having a mood disorder "with moderate anxiety and depressive features" as well as a moderate dysthymic disorder. AR 257. Based on these mental impairments, Dr. Johnson concluded that Ms. Lualhati would have the following functional limitations:

> [S]he would have marked difficulties concentrating and focusing on sustained, productive, timely work tasks in the normal course of a full 8-hour workday or full 40-hour work week. This is based upon the level of her depression and anxious tension alone, and her medical and physical conditions would likely add to that assessment. If she were to interact in a competitive employment setting as she did in this examination, . . . she would have marked difficulty maintaining pace and persistence in ordinary work tasks, or in the types of work that she describes in the past.
>
> . . . [S]he would have moderate difficulty communicating with others, including the general public, co-workers, and supervisors. . . . [S]he would have marked difficulties interacting *rapidly* with others in coordinated joint work tasks.
>
> . . . [S]he would have mild difficulties maintaining attendance in locations, based purely upon her psychiatric condition. However, her medical symptoms and conditions would likely add to that assessment. She did come to this examination unaccompanied, having driven a vehicle.
>
> . . . [S]he is capable of managing supportive funds, based upon her generally adequate performance of simple numerical tasks.

AR 258.

In his decision, the ALJ expressly acknowledged the opinion of Dr. Johnson but ultimately gave it "little significance" on the basis that it was "inconsistent with recent progress notes from Kaiser [*i.e.*, treating medical sources] which document claimant depression is stable on medications." AR 25 (ALJ decision). The ALJ referred to the following evidence from Ms. Lualhati's treating physicians:

• A diagnosis from her treating physician, Vincent J. Dilella, in January 2007, that her depression was in remission. The physician's notes indicate that Ms. Lualhati's mental

7

1    status examination was normal[2]; that no changes to her medication were needed; and that
2    there were no signs or symptoms of depression. *See* AR 204 (medical record, dated
3    1/11/2007).

4  • A diagnosis from her treating medical source,[3] Adrienne Kathleen Addicott, in June 2008,
5    reaffirming that Ms. Lualhati's depression was in remission. The medical source's notes
6    indicate that Ms. Lualhati's mental status examination was normal (*e.g.*, attention and
7    concentration were described as normal, insight and judgment were described as good).[4] The
8    notes also state that Ms. Lualhati's depression appeared to be stable with medication
9    (Prozac). *See* AR 384-86 (medical record, dated 6/11/2008).

10 • A progress note from her treating physician, Dr. Dilella, in September 2008, noting that Ms.
11   Lualhati's depression was improved with medication and assessing Ms. Lualhati's condition
12   as stable. *See* AR 390 (medical record, dated 9/23/2008). The note indicates that Ms.
13   Lualhati could increase the amount of her depression medication (from 60 mg daily to 80 mg
14   daily) if her mood were to decline but that she was currently reporting that her "mood has
15   been OK so far." AR 390.

16 • A progress note from her treating physician, Dr. Dilella, in January 2009, stating that Ms.
17   Lualhati was "[p]sychiatrically stable." AR 394 (medical record, dated 1/27/2009). The
18   note indicates that Ms. Lualhati had not been increasing the amount of her depression
19   medication (*i.e.*, above 60 mg daily) and that Ms. Lualhati was currently reporting her mood
20   as "OK." AR 394.

21   The ALJ's decision to credit the opinions of Ms. Lualhati's treating medical sources over the
22 opinion of Dr. Johnson was not error. "If a treating physician's opinion is 'well-supported by

---

[2] In her reply brief, Ms. Lualhati contends that none of her treating sources performed a "comprehensive psychiatric examination" on her. Reply at 3. While it is not possible to tell how extensive the mental status examination performed by Dr. Dilella was, the medical record clearly reflects that he did perform such an examination.

[3] Ms. Lualhati does not contend that Dr. Addicott, who appears to have a PhD, is not an acceptable medical source for purposes of 20 C.F.R. § 404.1513.

[4] Contrary to what Ms. Lualhati argues in her reply brief, *see* Reply at 3, it does appear that Dr. Addicott performed a comprehensive mental status examination.

8

medically acceptable clinical and laboratory techniques and is not inconsistent with other substantial evidence in [the] case record, [it will be given] controlling weight.'" *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (quoting 20 C.F.R. § 404.1527(d)(2)). Here, Ms. Lualhati does not contend that the treating sources' opinions are not well supported by medically acceptable clinical and laboratory techniques; rather, her only assertion is that the treating sources' opinions are not consistent with other substantial evidence, namely, the opinion of Dr. Johnson. Under Ninth Circuit authority, an examining physician's opinion can be substantial evidence, in particular when the examining physician

> provides "independent clinical findings that differ from the findings of the treating physician" . . . . Independent clinical findings can be either (1) diagnoses that differ from those offered by another physician and that are supported by substantial evidence or (2) findings based on objective medical tests that the treating physician has not herself considered.

*Id.* at 632.

But even assuming that, in the instant case, Dr. Johnson's opinion constitutes substantial evidence, that simply means that the opinions of the treating sources are not given controlling weight. *See id.* "Even when contradicted by an opinion of an examining physician that constitutes substantial evidence, the treating physician's opinion is 'still entitled to deference.'" *Id.* at 632-33. The weight to be accorded the opinion ultimately turns on the factors listed in 20 C.F.R. § 404.1572(d)(2)-(6). *See id.* at 632. Those factors include the length of the treatment relationship and the frequency of examination; the nature and extent of the treatment relationship; the supportability of the treating source's opinion; the consistency of the treating source's opinion with the record as a whole; and the specialization of the treating source.

Taking into account the above factors, the Court concludes that the ALJ did not err in according the treating sources' opinions – in particular, Dr. Dilella's – more weight than Dr. Johnson's. Regarding the length of the treatment relationship and the frequency of examination, Ms. Lualhati's own statements reflect that she has had a relationship with Dr. Dilella at least since 1998. *See* AR 14 (e-mail, dated 5/18/2009). Also, the medical records reflect that she saw Dr. Dilella or a member of his office on a fairly frequent basis from November 2006 to January 2009. *See* AR 201-

9

05, 369-77, 382-83, 390-91, 394-95 (medical records). With respect to the nature and extent of the treatment relationship, the medical records indicate that Ms. Lualhati sought treatment from Dr. Dilella for her mental impairments specifically and that Dr. Dilella was the primary physician to treat her mental impairments. Regarding the supportability of Dr. Dilella's opinion, it appears that he conducted at least one mental status examination, *see* AR 204 (medical record, dated 1/11/2007); moreover, his opinion that Ms. Lualhati's depression was in remission and/or stable was supported by her responsiveness to the medication and the lack of any need to alter the dosage. *See* AR 394 (medical record, dated 1/27/2009). As for the consistency of opinion with the record as a whole, Dr. Dilella's opinion was consistent with that of the other treating source, Dr. Addicott, *see* AR 384-86 (medical record, dated 6/11/2008), as well as that of a nontreating, nonexamining physician. *See* AR 264-74 (Lucila opinion, dated 4/30/2007). Finally, Ms. Lualhati's own representations reflect that Dr. Dilella has a specialty in psychiatry. *See* AR 14 (e-mail, dated 5/18/2009).

None of the arguments presented by Ms. Lualhati in her papers establishes that Dr. Johnson's opinion – based on a one-time examination of Ms. Lualhati – should have been given more weight. For example, the fact that one progress note from Dr. Dilella predated Dr. Johnson's opinion is insignificant given that there are multiple notes from Dr. Dilella post-dating Dr. Johnson's opinion. Also, the fact that Dr. Johnson is a specialist is a point that should be taken into account, but as noted above Dr. Dilella appears to be a specialist as well. In her papers, Ms. Lualhati argues still that, even if her "depression [were] stable on medication, that does not necessarily mean that her depression is not disabling." Mot. at 10. The Court notes that there is a difference between suffering from a mental impairment and being disabled as a result of that impairment. *See* 20 C.F.R. § 404.1505(a) (defining "disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months"). Here, the treating sources' reports indicated that Ms. Lualhati's depression was in "remission" and that her mental status examinations were normal. Hence, it was within the range of the ALJ's discretion to afford greater weight to the treatment notes of Ms. Lualhati's treating sources than to the report of examining physician, Dr. Johnson, in determining her residual functional capacity. *See*

*Tommasetti*, 533 F.3d at 1041-42 (noting that ALJ is final arbiter in resolving ambiguities in the medical evidence).

As a final point, the Court notes that the ALJ's decision to credit the treating sources over Dr. Johnson -- *i.e.*, to conclude that she had no real mental limitations -- was consistent with Ms. Lualhati's own testimony which reflected that she had no such limitations. Most notably, Ms. Lualhati indicated, during the hearing before the ALJ , that she had no difficulty with concentration. More specifically, Ms. Lualhati testified that she did not have trouble with concentrating while she reading "if it's a good book." AR 59 (ALJ hearing); *see also* AR 169 (function report) (stating that she reads for four hours). The ALJ made specific note of this testimony in his decision. *See* AR 26 (ALJ decision).

B.  Additional Physical Impairments

At step four of the five-step sequential evaluation process, an ALJ must determine what the claimant's residual functional capacity is – *i.e.*, what the claimant can still do despite her impairments. In the instant case, Ms. Lualhati contends that the ALJ ignored the fact that she suffered from fibromyalgia, incontinence, and Sjogren's syndrome and therefore his assessment of her residual functional capacity was incorrect.

As Ms. Lualhati maintains, she does appear to have been diagnosed by a treating medical source with fibromyalgia, incontinence, and Sjogren's syndrome.[5] *See* AR 425-26 (medical record, dated 12/10/2007). Moreover, as Ms. Lualhati asserts, the ALJ did not in his decision identify any of these medical conditions as an impairment from which she suffered.[6] *See* AR 23 (ALJ decision) (stating that Ms. Lualhati suffers from "sleep apnea, degenerative arthritis of the hands and hip joints, history of emphysema, and history of atrial fibrillation (AFIB), and obesity"). On the other hand, it should be noted that Ms. Lualhati never identified any of the above impairments in her

---

[5] The Court notes that this diagnosis was made in December 2007, *i.e.*, almost a year after her alleged onset date. For purposes of this opinion, the Court assumes that the diagnosis was of impairments existing as of the alleged onset date.

[6] The ALJ did refer to myalgia in his written decision, *see* AR 26 (ALJ decision), but not to fibromyalgia specifically. The Court notes that, according to the medical records, Ms. Lualhati's myalgia was stable. *See, e.g.*, AR 348 (medical record, dated 7/27/2007).

11

original application for benefits. *See* AR 113 (disability report); AR 69 (notice of disapproved claims). While Ms. Lualhati seems to have eventually identified incontinence as an impairment – in conjunction with her request for reconsideration, *see* AR 77 (notice of reconsideration) – at no point does she appear to have identified either fibromyalgia or Sjogren's.

Ms. Lualhati's failure to identify, at the very least, fibromyalgia or Sjogren's is problematic, *see, e.g.*, *Seales v. Astrue*, No. 1:07-cv-01384-TAG, 2009 U.S. Dist. LEXIS 24578, at *50-51 (E.D. Cal. Mar. 25, 2009) (concluding that, "[b]ecause Plaintiff has not shown that he raised the issue of obesity before the ALJ or the Appeals Council, Plaintiff has waived his right to obtain judicial review of the issue here"), particularly because it is not clear that the record should have alerted the ALJ to these impairments. For example, fibromyalgia appears to be referenced in only one medical record, *see* AR 426 (medical record, dated 12/10/2007), and Sjogren's in only two. *See* AR 412 (medical record, dated 10/2/2008); AR 426 (medical record, dated 12/10/2007). *Compare Clifford v. Apfel*, 227 F.3d 863, 873 (7th Cir. 2000) (noting that the plaintiff "did not claim obesity as an impairment when filing her Disability Report" but that "the evidence should have alerted the ALJ" to this impairment because there were "numerous references in the record to [her] 'excessive' weight problem"), *with Kitts v. Apfel*, 204 F.3d 785, 786 (8th Cir. 2000) (concluding that "ALJ was not on notice of a need to develop the record further" regarding a mental impairment because the plaintiff "did not allege a mental impairment in her application or at the hearing, and because the record shows only a diagnosis of anxiety and prescriptions for anti-anxiety medication from her family practitioner"); *Legrand v. Astrue*, No. 4:08CV326 FRB, 2009 U.S. Dist. LEXIS 24952, at *77-78 (E.D. Mo. Mar. 25, 2009) (noting that "[p]laintiff did not allege a mental impairment in his application, nor did he testify to a mental impairment at the hearing before the ALJ" and that "a review of the voluminous treatment record shows only a diagnosis of reactive depression by plaintiff's primary care physician, with such diagnosed condition considered by the same physician to be in remission one month after the initial diagnosis"; this was "scant evidence" insufficient to put the ALJ on notice).

But even assuming that the ALJ was properly on notice of fibromyalgia and Sjogren's, not to mention incontinence, that does not mean that his residual functional capacity assessment was

necessarily incorrect simply because he did not discuss these impairments in his decision.  First, with respect to Sjogren's, the medical records do not indicate that Ms. Lualhati had any limitations as a result of the impairment.  Indeed, the treating source characterized the impairment as "mild" and "basically stable."  AR 412 (medical record, dated 10/2/2008); AR 426 (medical record, dated 12/10/2007).  *See, e.g.*, *Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (noting that the Secretary "need not discuss all evidence presented to her"; instead, "she must explain why '*significant* probative evidence has been rejected'") (emphasis added).  Second, for all three impairments – fibromyalgia, Sjogren's, and incontinence – Ms. Lualhati has not identified any limitations arising from those impairments that the ALJ did not take into account in determining her residual functional capacity.  *See Burch*, 400 F.3d at 684 (noting that the plaintiff "has not set forth, and there is no evidence in the record, of any functional limitations as a result of her obesity that the ALJ failed to consider").  Although Ms. Lualhati has in her reply brief identified common symptoms of, *e.g.*, fibromyalgia, *see* Reply at 6, that does not necessarily mean that she exhibited those symptoms.  Moreover, some of those symptoms – for instance, fatigue – were accounted for in the ALJ's residual functional capacity assessment.  *See* AR 26 (ALJ decision) ("find[ing] the claimant credible to have some fatigue and trouble concentrating").  Similarly, some of the symptoms of Sjogren's – for instance, arthritis – were taken into consideration by the ALJ by virtue of the fact that he found Ms. Lualhati to be suffering from degenerative arthritis of the hands and hip joints.  *See* AR 23.

Accordingly, in light of the record and Ms. Lualhati's failure to raise these physical impairments and more importantly, any material functional limitations therefrom, the Court finds no ALJ error with respect to his failure to specifically discuss fibromyalgia, Sjogren's, or incontinence.

C.      <u>Credibility</u>

In his decision, the ALJ found that Ms. Lualhati's testimony about her symptoms arising from her impairments was only partially credible.  *See* AR 26 (ALJ decision).  Ms. Lualhati argues that this finding was erroneous.

> To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis.  First, the ALJ must determine whether the claimant

13

> has presented objective medical evidence of an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." The claimant, however, "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." "Thus, the ALJ may not reject subjective symptom testimony . . . simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged."
>
> Second, if the claimant meets this first test, and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so."

*Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007).

In the instant case, the ALJ concluded that Ms. Lualhati's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." AR 26 (ALJ decision). In other words, Ms. Lualhati had satisfied the first step of the above credibility analysis. But the ALJ went on to conclude that Ms. Lualhati had not completely satisfied the second step, holding that her statements about the severity of her symptoms were only partially credible. In arriving at the conclusion that Ms. Lualhati was only partially credible, the ALJ took note of, *inter alia*, (1) the opinion of a nontreating, examining physician, as well as the opinion of a state agency medical consultant, that Ms. Lualhati was capable of doing medium level work; (2) medical records from her treating medical sources indicating that her medical conditions were stable; and (3) her daily activities, which included taking care of her grandchildren,[7] preparing meals, doing household

---

[7] At the hearing before the ALJ, Ms. Lualhati testified that she does not take care of her grandchildren. *See* AR 58 ("I don't take care of them. My grandson is 10. My granddaughter is 13. So they're – no. I'm very close with them but I don't – if the mother goes to therapy and I'm there, that's me staying home with them."). But this testimony was not consistent with previous statements made by Ms. Lualhati. *See* AR 120 (function report) ("3 days a week I pick up my grandchildren from school. Help with homework."); AR 121 ("I pick up grandchildren from school 3x's a week. Cook dinner for them 3x's a week."); AR 166 (function report) ("I watch my 2 grandchildren after school and serve dinner. Ages 9 and 12."); AR 166 ("My daughter in law lives with me and her and I take care of her kids."); AR 172 ("My grandchildren come home around 3pm. Their Mom goes to work around then. Sit, read, watch TV and help kids with homework until dinner time. Prepare or serve dinner at 6pm. After dinner I play checkers with my grandson and do reading time with him for 45 minutes."). Nor was the testimony consistent with the statement of Ms. Lualhati's daughter-in-law, *i.e.*, the mother of the children. *See* AR 158 (function report – third party) ("She watch my kids while I'm at work.").

14

chores, driving, grocery shopping, running errands, and reading (without any trouble concentrating if the book were good). *See* AR 25-26.

The Court disagrees with Ms. Lualhati's contention that the ALJ's credibility findings were not sufficiently specific. As indicated above, the basis for the ALJ's credibility findings were clear – *i.e.*, the medical evidence and Ms. Lualhati's daily activities. *See* SSR 96-7p (stating that "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record"). The ALJ also clearly stated that he did not find Ms. Lualhati credible to the extent her claims about her symptoms were not consistent with a residual functional capacity for light work. *See* AR 26 (ALJ decision). This was enough information to permit the reviewing agency and the Court to understand "the weight the [ALJ] gave to the individual's statements and the reasons for that weight." *Id.*; *see also Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (indicating that credibility findings are sufficiently specific so long as they permit a "court to conclude that the ALJ did not arbitrarily discredit claimant's testimony").

The Court also disagrees with Ms. Lualhati's assertion that, "once an underlying impairment capable of causing pain is established, [an] ALJ may not discredit testimony because the degree of pain or limitation is not supported by the medical evidence." Mot. at 14. "[W]hile subjective pain testimony cannot be rejected on the *sole* ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2007) (emphasis added); *see also* 20 C.F.R. § 404.1529(c)(1)-(2) (providing that, "[w]hen the medical signs or laboratory findings show that you have a medically determinable impairment(s) that could reasonably be expected to produce your symptoms, such as pain, we must then evaluate the intensity and persistence of your symptoms" and, "[i]n evaluating the intensity and persistence of your symptoms, we consider all of the available evidence, including . . . the signs and laboratory findings, and statements from . . . your treating or nontreating source"). In the instant case, the ALJ did not conclude that Ms. Lualhati was partially credible based on medical evidence alone.

Finally, the Court disagrees with Ms. Lualhati's position that the ALJ's credibility findings were erroneous because he failed to take into account her obesity, which could exacerbate the effects

of her other impairments. The ALJ's written decision clearly reflects that he considered her obesity. *See* AR 26 (ALJ decision).

While, as discussed above, many of Ms. Lualhati's arguments regarding the issue of credibility are not well founded, there is, as Ms. Lualhati argues, one significant problem with the ALJ's credibility analysis – more specifically, his discussion of her daily activities. The Ninth Circuit has held that, "daily activities may be grounds for an adverse credibility finding 'if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting.'" *Orn*, 496 F.3d at 639; *see also Burch*, 400 F.3d at 681 (stating that adverse credibility finding based on activities may be proper "if a claimant engages in numerous daily activities involving skills that could be transferred to the workplace").

In the instant case, the activities in which Ms. Lualhati engaged are arguably transferable to a work setting. *See, e.g.*, *Morgan v. Apfel*, 169 F.3d 595, 600 (9th Cir. 1999) (indicating that the claimant's ability to fix meals, do laundry, work in the yard, and occasionally care for his friend's child was evidence of his ability to work); *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) (noting that, "if, despite his claims of pain, a claimant is able to perform household chores and other activities that involve many of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that the claimant's pain does not prevent the claimant from working"). *Compare Orn*, 496 F.3d at 639 (describing daily activities of the claimant as "sometimes" reading, watching television, and coloring in coloring books, which failed to establish that the claimant "has 'transferable' skills to be a surveillance system monitor," a "position that requires sustained concentration and attention, as well as the ability to act immediately in emergencies").

But it is not clear that Ms. Lualhati was able to engage in such activities for a substantial part of her day, a point that the ALJ did not address. For example, although Ms. Lualhati did do household chores and grocery shopping, she did not engage in these activities on a daily basis. Indeed, she appears to have done these activities on a limited basis – *e.g.*, laundry every two weeks, cleaning once or twice a week, grocery shopping once or twice a week, and washing the dishes a

few times each week. *See* AR 159-60 (function report – third party); AR 120, 122-23 (function report); AR 167-68 (function report). Given this circumstance, the Court concludes that the ALJ's credibility determination, to the extent it was based on Ms. Lualhati's daily activities, was erroneous. The Court finds persuasive the district court's analysis in *Belcher v. Astrue*, 1:09cv01234 DLB, 2010 U.S. Dist. LEXIS 65509 (E.D. Cal. June 9, 2010). There, the court noted, in reasoning applicable here, that, "[t]o the extent the ALJ cites Plaintiff's 'physical' activities, such as cooking, taking out the trash or doing laundry, those activities are not performed frequently enough to support a finding that Plaintiff spends a 'substantial' portion of his day performing such activities." *Id.* at *43.

        Although the Court finds error here, it shall not automatically credit as true Ms. Lualhati's claims regarding her symptoms. There is a split in the Ninth Circuit as to whether the credit-as-true rule is mandatory or discretionary. *See Vasquez v. Astrue*, 572 F.3d 586, 593 (9th Cir. 2009); *see also Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003) (stating that "we are not convinced that the 'crediting as true' doctrine is mandatory in the Ninth Circuit" because, "[d]espite the seemingly compulsory language in [several cases], there are other Ninth Circuit cases in which we have remanded solely to allow an ALJ to make specific credibility findings").

        Moreover, even if the Court were to credit Ms. Lualhati's excess pain testimony, it is not clear that the ALJ would be required to award her benefits. *See Varney v. Secretary of Health & Hum. Servs.*, 859 F.2d 1396, 1401 (9th Cir. 1988). The ALJ concluded that Ms. Lualhati was capable of doing light work, and a job is in the category of light work "when it requires a good deal of walking or standing, *or* when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b) (emphasis added). Even if Ms. Lualhati's ability to walk or stand at length was debatable because she performed household chores and did grocery shopping on only a limited basis, that would not necessarily preclude her from performing a job which involved sitting most of the time. The Court acknowledges that Ms. Lualhati claimed to have limitations in sitting, and not just walking or standing, *see, e.g.*, AR 55 (ALJ hearing) (Ms. Lualhati testifying that, when she sits, "my butt goes to sleep and my legs start aching and then I have to get up and, and walk"); AR 127 (function report) (stating that she "become[s] stiff after sitting for 15/30

minutes"); AR 172 (function report) (indicating that, after sitting for ten minutes, she "get[s] stiff legs [and has a] spasm in back"); however, that testimony is in conflict with other testimony that she provided suggesting that she was in fact capable of sitting for extended periods of time. *See, e.g.*, AR 169 (function report) (stating that she watches television for about five hours and reads for four hours). And even if Ms. Lualhati had to take breaks from sitting to relieve any pain, *see* AR 55 (ALJ hearing) (Ms. Lualhati testifying that, when she sits, "my butt goes to sleep and my legs start aching and then I have to get up and, and walk"), it is not clear that this limitation would necessarily preclude her from working. That specific limitation was not considered by the vocational expert. *Cf. Vasquez*, 572 F.3d at 597 (stating that, "'where the testimony of the vocational expert has failed to address a claimant's limitations as established by improperly discredited evidence,' this Circuit has 'consistently . . . remanded for further proceedings rather than payment of benefits'").

D. <u>Lay Witness Testimony</u>

In support of her disability claim, Ms. Lualhati offered written testimony from two lay witnesses: (1) her sister, Judy Foster, *see* AR 136-43 (function report – third party), and (2) her daughter-in-law, Theresa Sespene. *See* AR 157-64 (function report – third party). Ms. Lualhati argues that the ALJ erred in concluding that she was not disabled because he did not take into account the testimony of these relatives.

Ms. Lualhati is correct that the ALJ's written decision does not make any mention of the testimony submitted by Ms. Foster. However, an ALJ is not required to "discuss all evidence presented to [him]"; instead, "[he] must explain why 'significant probative evidence has been rejected.'" *Vincent*, 739 F.2d at 1394-95. Here, the Court cannot conclude that the testimony of Ms. Foster constitutes "significant probative evidence." As the Commissioner points out, Ms. Foster appears to have had limited contact with Ms. Lualhati, seeing her every month or two months. *See* AR 136 (stating that "[we] just visit"; "[w]e usually see each other about every 4-8 weeks"). Accordingly, she was not in a strong position to be able to comment about Ms. Lualhati's limitations, in particular, her daily activities. *See Smolen*, 80 F.3d at 1289 (stating that "testimony from lay witnesses who see the claimant every day is of particular value"). Ms. Foster implicitly acknowledged this fact in her written statement, couching her responses with phrases such as "I

don't know" and "I think." *See, e.g.*, AR 136 ("I don't know for sure, since I don't live with her."); AR 137 ("I think . . . ."); AR 137 ("Don't know"); AR 138 ("I am not around Nancy on a daily basis, so I do not know."); AR 138 ("I believe . . . ."); AR 139 ("Probably . . . .").

In contrast to Ms. Foster, Ms. Sespene was in a strong position to be able to comment about Ms. Lualhati's limitations because she lives with Ms. Lualhati. *See* AR 47 (ALJ hearing) (Ms. Lualhati testifying that she lives with, *inter alia*, her daughter-in-law). However, the ALJ did address Ms. Sespene's testimony in his written decision. *See* AR 25 (ALJ decision) (discussing Ms. Sespene's testimony on Ms. Lualhati's activities). Ms. Lualhati argues that, even so, the ALJ ignored critical part of Ms. Sespene's testimony, most notably, her testimony that Ms. Lualhati had limitations on standing, walking, and sitting. *See* AR 158 (function report – third party) ("She was OK for sitting long time, walking [*i.e.*, prior to disability]."); AR 159 ("She can't stand too long."); AR 162 ("Can't stand too long or sit too long[,] the back ache occurs. Legs hurt."); AR 162 ("[She can walk] 2 blocks, rest for 5 min."). The Court is troubled by the ALJ's failure to comment on these claimed limitations but need not make a definitive ruling as to whether this failure constituted error as the Court will already be remanding the case for further proceedings based on the ALJ's error in assessing Ms. Lualhati's credibility. The Court notes that, even if it were to credit Ms. Sespene's testimony on Ms. Lualhati's ability to sit, stand, or walk, it is not clear – as discussed above – that these limitations would necessarily preclude Ms. Lualhati from working, particularly at the light level. That determination, if necessary based on reconsideration of the testimony, should be made anew by the ALJ on remand.

E.      Remand

For the foregoing reasons, the Court concludes that the ALJ erred in making his credibility determination and that a remand for further proceedings rather than an award of benefits is appropriate. The Court notes that, on remand, Ms. Lualhati's testimony regarding her limitations and the testimony of Ms. Sespene, in its entirety, should be reconsidered. The other claims of error are rejected.

### III. CONCLUSION

Accordingly, the parties' cross-motions for summary judgment are denied but their alternative motions to remand for further proceedings are granted.

This order disposes of Docket Nos. 16 and 19.

IT IS SO ORDERED.

Dated: July 29, 2010

_____
EDWARD M. CHEN
United States Magistrate Judge